Bentley, J.
Tbe City Solicitor of tbe City of Toledo, claiming to act under tbe authority of sec. 1777 of tbe Revised Statutes of Ohio, brought an action in behalf of and in tbe name of the city against the • Northwestern Ohio Natural Gas Co. in the court of common pleas of this county, for a mandatory injunction restraining the gas company from refusing to furnish gas to any person, company or corporation applying for the *560 same at the rate fixed therefor by an ordinance of said city, passed August 4th, 1890.
A preliminary injunction restraining the defendant from making contracts at rates in excess of those fixed by said ordinance was granted by a judge of said court of common pleas, and afterward, on final hearing in that court, that injunction was dissolved, and said petition was dismissed, and the city thereupon appealed the case to the circuit court, where it is now pending, and where it will stand for hearing by the court in term, whatever be the disposition of this motion. The city solicitor applied to the judges of the circuit court for a temporary mandatory injunction, and said application was, heard by the judges at chambers on last Monday. The arguments on each side and the briefs submitted evinced such thorough preparation, extensive research into the authorities, and able handling of the' principles involved, as was and is highly creditable to counsel and gratifying to us.
We have been holding court in another county since the day after election, and were urged to dispose of the motion to-day. While the pressuré of other duties has not been allowed to prevent our consideration of this matter so as to become satisfied with the justice of our conclusions, it has not allowed us to formulate such orderly statement of our views as we could wish.
The application was submitted without other evidence than-that afforded by the petition, which is sworn to positively, the answer, also, of course, under oath, and the reply.
Objection is made by the defendant that there was no authority to appeal the case on account of the peculiar nature of its submission to the court below. I have not before me the journal entry, but as I remember it, it was substantially that the plaintiff moved for judgment upon the pleadings in this case, and it was argued in behalf of the defendant that,, as the pleadings then stood, it was perfectly apparent that the case, would have to be dismissed if submitted simply upon the pleadings, and that, when the plaintiff made such a motion as. *561 that it was equivalent, virtually, to dismissing its petition, and therefore no appeal could lie.
While the statement of the journal entry is'perhaps a little-out of the usual form, yet we think substantially the same result obtained as if the journal entry had simply shown that the plaintiff submitted the case upon the pleadings — we think that that was the scope of his application and motion, and that therefore the plaintiff'might rightfully appeal from the decision of the court finally made in that action.
It is also claimed by defendant’s counsel that a mandatory injunction affecting the delivery of property, cannot be granted at an interlocutory hearing, but only as a part of a final decree of the court on the merits of the case in term. We think, however, that should we find that the plaintiff is entitled to relief, an order could be framed to accomplish the-purpose without violating the rules of law in that respect. ..
Some question is made as to the fundamental basis of the action which can be brought by a city solicitor under said section 1777 — whether he can bring such action to enforce a public duty owing by"a private corporation to a municipality and its citizens though not sounding in contract. Some suggestions on behalf of the city that this might be done and that this action is not necessarily based upon any contractual obligations, were made in reply to strong urging of the inviolability of contracts made by the defendant’s counsel, but we-conclude that the petition better sets forth the plaintiff’s true position, since it asserts a contract resulted from the acts ofthe plaintiff and defendant, and that founded on that and the alleged lawful steps thereafter taken, the defendant owed duties to the plaintiff which could be enforced. These views we-think, are supported by The Zanesville Gaslight Company v. Zanesville, 23rd Bulletin 70, (47 Ohio St. 35).
The petition shows that the eity itself is a consumer of gas-under the arrangements made with the defendant, and whatever may be its rights as to enforcing contracts for the benefit of others — its citizens — it may have a standing in court, for *562 the enforcement of whatever rights it has as a customer of the gas company, as was held in the Zanesville case. We recognize some difference between the objects and situation of the defendant corporation and corporations organized especially to furnish light to a single city, but we think that the defendant has devoted its property to a public use to such a degree as to warrant the legislature providing for the reasonable regulation of its charges, if it can be done without the impairing of the obligation of contracts prohibited by the constitution.
The petition alleges and the answer admits, that the defendant is a corporation for profit, organized and existing under the laws of the state, but the terms of its certificate of incorporation are not definitely set forth.
The pleadings also show that on the 5th day of September, 1886, the city council of this city passed two ordinances granting to the defendant and another corporation, respectively, the right, on certain conditions, to lay, maintain and operate gas pipes in the city for heating and power purposes, and that said corporations duly accepted the terms and conditions of the ordinances. The ordinances are set out in full, and it is shown that the two corporations afterwards became consolidated, and the defendant succeeded to the rights and liabilities of both'. The ordinance as to the defendant, after providing in several sections as to the manner of laying pipes, making connections, and operating in the streets, has these provisions in sec. 8 :
“ Should said The Northwestern Ohio Natural Gas Company, its successors or assigns, neglect or fail to prosecute with all reasonable diligence, the work of bringing natural gas to Toledo, for the foregoing purposes, and fail to furnish a reasonable supply of the same by October 1st, 1887, the franchise and privileges herein granted may be, by resolution duly passed by said common council, declared forfeited, and all rights hereby acquired shall then determine and cease. The right to further regulate the furnishing of said natural gas to consumers shall be subject to such terms and conditions as *563 said common council and said company or corporation may hereafter determine upon.
“ This ordinance and all rights herein granted shall be subject to any general ordinance or ordinances which may hereafter be adopted by the common council, regulating the mode and manner of laying, relaying and repairing the mains or pipes, conductors, connections and drips, and the conducting ■of gas through the streets, lanes, alleys, squares, docks and lands of said city, not inconsistent with the provisions of this ordinance.”
The ordinance as to the other corporation (The Toledo Natural Gas Company) contains the following provisions, after providing for the laying and maintaining of pipes, etc., as in the other ease.
“ Sec. 8. Should said The Toledo Natural Gas Company, its successors or assigns, neglect or fail to prosecute with all reasonable diligence, the work of bringing natural gas to Toledo for the foregoing purposes, and fail to furnish a supply of the same by October 1, 1887, the franchises and privileges herein granted may be, by a resolution duly passed by ■said common council, declared duly forfeited, and all rights hereby acquired, shall then determine and cease,
“ The right to further regulate the furnishing of said natural gas to consumers shall be subject to such terms and conditions -as said common council and said company or corporation may hereafter determine upon. This ordinance and all rights herein granted shall be subject- to any general ordinance, or ordinances which may hereafter be adopted by the common ■council regulating the mode and manner of laying, relaying and repairing the mains or pipes, conductors, connections and drips, and the conducting of gas through the streets, lanes, .alleys, squares, docks and lands of said city, not inconsistent with the provisions of this ordinance.
“ Sec. 9. Within thirty days after the passage of this .ordinance the said company shall execute and deliver to the *564 City of Toledo, an agreement in such form as shall be approved by the city solicitor, expressing the assent of said company to and undertaking to perform the terms and ’requirements of this ordinance on its part, and to furnish gas to all persons requiring it in the city of Toledo (so far as"said company may be able), without preference or favoritism, on equal terms and at reasonable prices, reference being had to the cost of producing and delivering the same and the prices of like supplies in other cities.”
On the 5th da}7 of July, 1887, the city council passed an ordinance regulating the price of gas to be charged by said companies for three years, and the companies, in writing filed with the city clerk, accepted the terms of said ordinance, and have furnished gas in accordance therewith.
On the 4th day of August, 1890, after the expiration of' said three years, the city council, claiming that under the authority of sec. 2478 of the Rev. Stat., as amended March 4th, 1887, (84 Ohio Laws, p. 39) it had the absolute right to fix the price to be charged by the defendant for gas, without reference to the will of the defendant, passed another ordinance fixing the price to be charged for fuel gas. And the defendant, insisting that said ordinance is invalid, both because it had not agreed to its terms and because it provided for unjust discriminations and favoritism, and certain other unreasonable provisions, and fixed inadequate prices, and was passed under the influence of improper conditions and motives, refuses to recognize or comply with it.
It is to compel compliance with this ordinance that this-action is brought.
The city claims that no contract binding upon it'arises out of the said original grants and their acceptance^ for that its-acts in making said grants were ultra vires, no law then existing permitting it to allow such use of its streets.
To hold this doctrine, would necessitate a refusal of the-city’s motion, since in such case there could be no contract to specifically enforce, and no public duty created by contract *565 whose evasion or violation the city solicitor in such action as this is authorized to correct or punish. The rights of the public in such case must be vindicated in a different form of .action.
But we think it is manifest that the city had the authority to allow the use of its streets for the purposes named ; that it is a public use, is the ground on which the right to regulate it is asserted and maintained. Whether the right to make such grant arises from the general grant of power to muni- • cipal corporations, as has been contended for, or under other and more definite statutory provisions, it is perhaps unnecessary now to determine in settling this general claim. Up to the time of the passage of the act amending sec. 2478 in March, 1887, there was not any general law specifically •authorizing cities to grant rights in their streets to natural gas ■companies by name ; that act assumes the prior power to make such grants, and recognizes the lawful establishment and existence of natural gas plants in the streets of municipal cities.
WThat is commonly called the “heat and power act” of of 1880, is broad enough in its terms to cover the supplying of heat and power by means of natural gas, unless we conclude that its generic terms are to be limited so as to apply to ■agencies then generally known and used. Evidently that statute was in the mind of those concerned in the drafting of said original ordinances, as they grant the right to lay pipes for supplying heat and power; and in view of what we have ■said above, we are unwilling to say that that act would not •authorize such grants, but we will recur to this further on.
It is contended by the city that, even granting the power to make the contract, the terms regarding further regulations do not allude to the fixing of prices. Without now going into an analysis of the language employed, we have no doubt that that was in the minds of both parties to the arrangement, and that so far as authority- existed to enter into it, the parties made an agreement that the prices to be charged for gas should *566 be fixed from time to time by mutual or concurrent action of the city and gas companies.
These various questions already disposed of, while important, have been of comparatively easy solution, contrasted with those which, in our judgment, lie at the root of the controversy ; that is:—
1. To what extent, in the absence of express statutory authority or prohibition, might a municipality bind itself as to future action, or disqualify itself from receiving and exercising a power of regulation afterwards expressly conferred upon it by the legislature?
2. What is the just and necessary effect of the amendment of March 4th, 1887, upon the relations of these parties?
We concluded, upon the first, that these parties had the right to make the agreement that the prices to be charged for gas should be fixed by mutual consent, and that that agreement would be binding upon both until the legislature, by reason of its reserved power, under the constitution, might alter, amend or annul the defendant’s charter, or might confer the sole power of the reasonable regulation of prices upon the city council or other agencies selected by the legislature. We must presume that both parties contracted with reference to this superior power, and subject to the conditions and provisions “ imported by law” into every such contract, so that it is as if a provision covering the necessary limitations and conditions were inserted by the parties themselves in the wording oftheir compact. But until the legislature should pass some act necessarily interfering with or abrogating the contract, its terms and conditions are to be regarded and enforced as other contracts.
Some light upon the city’s relation to its streets is afforded by what is said on pages 304 to 306, 29 Ohio St., in the case of Cincinnati, St. R. R. Co. v. Smith. This was an action regarding a street railroad company, as the name of the party would indicate, but in it arose a question as to whether the city solicitor had the right, under the section of the code, to bring *567 such an action as was brought there, and in disposing of the ease the court say, among other things:
“ The action was brought to enjoin (1) an abuse of corporate powers by the city, and (2) the execution and performance of a contract about to;be made in behalfof the corporation in contravention of the laws or ordinances governing the same, it not being claimed that the facts stated in the petition show that there is to be any misapplication of corporate funds.
“Following the order in which objections are made in argument by counsel for plaintiff in error, the first stated in effect this : That section 159 does not refer to or include contracts in general, but is confined to contracts made in behalf of the city, in contravention of the laws and ordinances governing the same, and that a contract formed by the acceptance of a grant made by the city of an easement in its public streets, is not a contract made in behalf of the city.
“This objection is made upon the assumption that the city has no property right in the public streets. And it is contended, that such property being in the public, the grant is a contract made in behalf of the public, in the making of which the city does not act in its own behalf as a corporation, but as the agent of the public, in the exercise of a governing power of the state, delegated to it in the particular instance to be executed in the mode authorized.
“ The correctness of this assumption may be determined by the provisions of the statute on the subject.”
The court then recites sec. 6 of the act to provide for the recording of town plats, as bearing upon the fee which it vests in the streets, and follows the quotation with this :
“ This vests the fee of the streets in the corporation, subject to the right of the state to direct the mode of administering the trust. So far as the state has assumed to do this, it is binding on the corporation.
“ The 439th section of the municipal code provides : ‘The council shall have the care, supervision and control of all public highways, bridges, streets, avenues, alleys, sidewalks, and *568 public grounds within the corporation, and shall cause the same to be kept open and in repair, and free from nuisance. This is substantially a re-enactment of the provisions of former laws.
“ It seems to us that the provisions of these sections negative the claim that the proposed contract between the city and the defendant street railroad companies when the easement granted in the streets is accepted by them, will not constitute a contract made in behalf of the city. The city holds the fee of the streets in trust for the uses intended, add the care, supervision and control of them is expressly imposed upon the council.”
Citing the provisions of the 411th section of the municipal code.
“These sections taken together show that the state, in its sovereign character, has reserved no property interest in the streets in question. The revenues and profits that are to accrue from the use of the streets in the mode contemplated will be the private property of the city, in which the state has no interest whatever.
“Under the plain provisions of the sections quoted, authorities need not be quoted to show that the proposed contract, if consummated, would be one made in behalf of the corporation.”
One of the Zanesville cases cited holds that in granting the right to lay pipe in the streets, the city might properly provide the maximum rate to be charged for gas.
The Ironton case recognizes that a contract for 20 years, made while the council was limited to ten years, might be valid, but at the expiration of the 10 years would become wholly inoperative; and all of the Ohio cases recognize this principle, that if a municipality, under a statutory authority, has made a contract fixing a price, subsequent legislation cannot interfere with it during the period covered by the authority.. _ ;
_ Had the city statutory authority to make the contract; or, *569 has it by legislation received such direction or power as to abrogate its provisions ?
The act of 1880 provides : (In this book — Giauque’s Statutes — it seems to be put down as sec. 9219):
“Sec. 1. That any municipal corporation may, by ordinance, use or grant the use of its streets, avenues, alleys, lanes and other public places, to lay pipes and drains under the surface thereof, to be used for the purpose of supplying its inhabitants with heat and power, upon such terms as such corpora-ton may deem proper.
“Sec. 2. That in all municipal corporations which have heretofore, by ordinance, authorized the use, by any person or corporation, of the streets, avenues, alleys, lanes and other places of such municipal corporation, for the purpose of laying pipes and drains below the surface thereof, to convey and supply its inhabitants heat and power, such ordinances shall be held as valid and binding as if the power in all such municipal corporations to so grant such use of its streets; avenues, alleys and public places had been expressly enumerated in the general municipal corporation act now in force; provided, that the councils of such corporations are empowered to regulate, by ordinance, at intervals of five years, the price which such person or company may charge for such heat or power.”
This divided the years into blocks of five, and gave the council full authority to legislate upon the subject so as to cover such periods of five years. Had the council contracted in advance with the defendant for five years as to the rates, we think few would doubt the validity of the contract.
We think this act broad enough to cover these grants, although the statutes regarding illuminating gas had many features and expressions applicable to fuel gas.
When the legislature came to legislate directly upon the subject, it seemed to assume the existence of natural gas plants in cities, as I have already said, and placed its provisions, not in an independent act, but as a mere amendment to secs. 2473 and 2491, thus incorporating theih in a chapter of *570 several sections, some of which clearly comprehend a reference-to natural gas after the amendment is in; that is, 2478, after-the amendment, (it has been amended since that time as to-•electric lights,) reads as follows:
“ The council of any city or village in which electric lighting companies, natural or artificial gas companies-, or gas light or-coke companies may be established, or into which their wires mains, or pipes may be conducted, are hereby empowered to regulate, from time to time, the price which said electric lighting, natural or artificial gas and coke companys, may charge for electric light or for gas for lighting or fuel purposes,, furnished by such companies to the citizens, public grounds- and buildings, streets, lanes, alleys avenues, wharves and landing places; and such electric lighting, natural or artificial gas, or gas light and coke companies, shall in no event, charge more for any electric light, or natural or artificial gas furnished to such corporation or individuals than the price specified by ordinance of such council; and such council shall also have the power to regulate and fix the price which such companies shall charge for rent of their meters. '
“Sec. 2479. In case the council fixes the minimum price at which it requires any company to furnish gas to the citizens,, or public buildings, or for the purpose of lighting the streets,, alleys, avenues, wharves, landing places and public grounds, fora period not exceeding ten years, and the company assents thereto by written acceptance, filed in the office of the clerk of the corporation, it shall not be lawful for the council to require such company to furnish gas at a less price during the period of time agreed on, not exceeding ten years, as aforesaid.”
Sec. 2479 remains unamended, and reads now as it did prior to the act of March 24, 1887, and in the act was incorporated the provisions regarding the natural gas companies, by name.
“Sec. 2482. A neglect to furnish gas to the citizens and other consumers of gas, or to the corporation, by any company, *571 in accordance with the prices fixed and established by the council, from time, to time, shallj forfeit^ all rights oí sucir company under the charter by which it has been established;' and the council may proceed to erect, or, by ordinance, empower any person to erect gas works, for the supply of gas to-such corporations and its citizens; provided, that nothing in' this section, or in sections 2479 and 2480, shall operate to impair or affect any contract heretofore made between any municipal corporation and any gas light and coke company.”
Sec. 2491 by its amendment authorized the council to allow-natural gas to be placed in the street.
We think that the legislature must be held to have intended that at least the provisions of sec. 2479 should apply to natural gas as well as to artificial gas, and clearly recognized the power of the council to enter into binding contracts regarding rates for a period of ten years, thus extending the period that might-have covered the subject under the heat and power act.
If the council had by ordinance and it acceptance made a-' contract for ten years under this amendment, clearly it would be binding for the entire period. Instead of having, done that, it had previously made a reasonable contract indefinite as to its time, but which, if now made, would by intendment of law, be limited to ten years. Can it be justly held that the legislature intended by the act of March 4th, 1887, to annul such contract as had been made before, and-which but for the act would bo good, not by taking away any power from the city, but by the very act of granting it power to make such contract good for ten years? Wc think that a condition working such results could not reasonably be imported by law as entering into and forming part of this contract from the start, and be liable, like a worm, at its maturity, to destroy it.
But it may be objected that this orignal ordinance did not fix rates, but only left the parties to agree upon them ; and that they did agree for three years. , We hold that this original agreement requiring the rates to be fixed by agree *572 •rnent, has a continuing force for ten years from its adoption, .and only for that period ; and the ordinances made under it from time to time, when accepted, constitute the continuing carrying out of its terms for the periods limited in them, but do not effect its round and completed fulfilment until the ten years have expired, at which time the city will possess full power of fixing reasonable rates. It may be said that even under the provisions of this original ordinance the city should maintain this action. That the contract having provided that ■the rate should be established by agreement of the city and the gas company, and it being alleged that the city has passed .an ordinance which it says is perfectly reasonable, and that the gas company refuses to abide by it or recognize it, therefore a case might be made under the contract in the original ■ordinance itself, since an agreement with the municipality must be arrived at by the way of proposition on one side and acceptance or rejection on the other side. But the defendant denies the reasonableness of the ordinance passed. And we think the whole petition in its scope and meaning is evidently intended to enforce the idea that the city council, having, without reference to any contract or agreement with the company, passed this ordinance, has the right to have it enforced. The petition, by its averments and prayer, is not aimed at this condition of affairs, above stated. It may be said that such a contract as the one that was made would leave the city at the mercy of the defendant company; that is, that it might say to any proposition or ordinance that it would not agree to it; and that therefore the consequence would be that it might it.self fix the terms and rates by which it could charge for|gas. But, under circumstances of that kind, the remedy would be plain and clear; while the contract is that the rates shall be fixed by agreement of the parties, it would not be competent for one party unreasonably to refuse to enter into such an ■.agreement, when a reasonable proposition to it, and'such an one as it ought to have accepted, is made. When such a case *573 as that is presented, undoubtedly a remedy for the city -would be found in account of equity.
In view of the holdings which w7e have® made in this case, we think that w’e'need not®nccessarily [determine whether the act granting municipal authorities the right to fix prices is in conflict with the constitution of the United States as interpreted by the supreme court of Ohio.
The ¡pleadings in the Ironton case differ materially frem those in this case — the answer being different. And w'hile there is the general statement in that case that unless bad or improper motives are charged upon the council, and issuable facts are pleaded in that direction, the ordinance passed by the village would- be conclusively deemed to be reasonable. "While, I say, the Ironton case involves that proposition, we do not think that, necessarily, in the hearing of the case, we would be bound by the statement of the law in the Ironton case as to hearing evidence. We apprehend that a distinction could well be made, and ought to be made, between this case and that.
Counsel for defendant have cited a late case from the Supreme Court of the United States, coming up from, and involving a case decided by the Supreme Court of Minnesota, which holds that the law7 of the State of Minnessota regarding the fixing of railroad rates by a commission is unconstitutional, as interpreted by its supreme court, and they claim that by analogy the same principles are involved in the attitude of our own supreme court as expressed in the Ironton case; and that it necessarily results from this opinion of the United States Supreme Court, that the Statute of Ohio, thus interpreted,, would be unconstitional. I think, however, I will not take the time to go over the authorities regarding this matter or to-analyze more fully the opinion of the Supreme Court of the United States as pronounced in that case and other cases; but it seemes to be recoonized again and again in the courts generally, and in the Supreme Court of the United States, that this power of regulation is not without limit. And the Su *574 preme Court of the United States so say in so many words in. , the case of Shields v. Ohio, decided by the Supreme Court of the United States in the 95th U. S., in which it is said that where a legislature even, should attempt by any unreasonable -legislation ^to fix prices so that they would be ruinous, a remedy could b sought in these courts, and would be obtained. The opinion is in 34 U. S., cited by counsel, is in line with .this, and we think, with the better reasoning of the case.
If, however, it may be considered in any way that this action ought to proceed as one presenting a case where, in violation of this original contract, there has been a refusal and failure on the part of the company to observe its provisions, then the question is presented, whether or not, upon the statement of this case, upon the mere pleadings — upon the petition, denied by answer as it is, and the affirmative allegation of the answer, the presumptions arising as to the reasonableness of the ordinance, are of sufficient strength to warrant us in granting a preliminary injunction, mandatory in its effect. Cases are cited from the Supreme Court of Ohio and other cases, holding that an ordinance of a municipal corporation fixing the rates to be charged by a corporation will be presumed to be reasonable ; and, as was said in the Ironton ease, except under certain circumstances, charging bad faith or improper motives, or something of that kind, the adequacy of the price fixed by the ordinance is not inquirable into by the court, but that the reasonableness and propriety of the rates will be conclusively presumed.
We think that whether the ordinance is thus unassailable, and whether the presumptions arising from it are not to be eontradicted, depends upon how its consideration arises in the case.
If, now, as claimed by the city, the city had a right without the agreement of the defendant company, to pass this ordinance, fixing the rates, and the city had the right to enforce it simply because it did pass the ordinance, these presumptions, under the rule of the supreme court, must obtain, and we must say that. the petition setting forth the ordinance, and the *575 answer not denying it, it is shown sufficiently that there is an uni’easonable rejection of a reasonable ordinance. But, holding as we do, that this ordinance must be judged with reference to the original contract made between the parties, we think a different case arises — that is, the city in such a case presents this ordinance and makes claim that it was unable to agree with the defendant company; that the company unreasonably refuses to agree to reasonable prices; and that therefore by very force of the situation it was driven to an action to compel an observance of that part of the defendant’s contract. ’
Now, when the ordinance is used for that purpose, and presented to the court, we think that the presumption of the reasonableness of its provisions are-not conclusive, as they would be in the other view of the case ; but that, its reasonableness being denied, it stands like the allegations of any other act of the municipality, or the act of any other such contracting party. And when it stands contradicted — denied—and with affirmative allegations in the answer alleging its unreasonableness and impropriety, it calls upon the city for some proof, in the first instance, to sustain the allegations of the petition over the denials and averments of the answer.
Now, the ordinance which was passed on the 4th of August, which was sought to be enforced in this action, has various provisions. This ordinance provides for fixing the rates to be charged for one year from the 25th day of July, 1890. It provides that it shall not exceed the following, to-wit: Then follow various rates; for cooking ranges, for laundry, for heating, for mixers, and providing for different rates to be charged by the company, according to the use to which it is applied; and among its provisions is sec. 5 :
“ No consumer now receiving and using natural gas through a mixer or mixers shall be compelled, against his desire, to receive and use natural gas by meter measurement; and no consumer now receiving and using natural gas by meter *576 measure shall be compelled, against his desire, to receive and use natural gas through a mixer or mixers; and no person, company or corporation, shall be compelled, against his or its desire, to receive and use natural gas in any other manner than he or it is now receiving and using the same.’’
It is claimed by the defendant company that to use the mixer is a wasteful way of using gas, and an improper way of providing for the charges regulating it; that by mixer it makes no difference in the price charged, how long the fire is kept burning — whether it burns one day, or all days and all nights, or only a short time, and it would necessarily result that if this company was compelled to furnish gas by mixer to one party, and might exact that the next one, or another party, should use a meter for measurement, that a great difference in the price actually to be paid by the two parties would result; and that by using mixers there not only is in fact a great waste of material, but that by using them the supply o f natural gas, which it claims must have a limit, would be sooner exhausted, and the consequence would be that by this wasteful way of measuring gas by the use of mixers, very soon, or sooner than otherwise would happen, the people generally would be deprived of having gas at all; and further than that that the prices thus to be paid would be unequal; that the company ought at least to be allowed to provide some manner in which the prices should have reference to the amount of gas consumed by each party, and not simply to the size of the orifice through which gas is delivered to the party.
Upon the reading of that section, either with or without these suggestions, it would be manifest to any thinking person that there is an injustice in compelling the company to observe at least that section of the ordinance. And if this ordinance is to be enforced as a whole, it has at least that unreasonable and improper condition in it.
It is claimed that that might be left out, and that the ordinance might be enforced by holding that section bad, and enforcing the rest of it, in as much as it'is a separate section. *577 But the action here is to enforce the provision's of this ordinance as it stands. For myself, I cannot see the justice of arranging a schedule of prices with reference to anything else than the quantity of gas consumed by the different parties, no matter what the gas is used for; and with that difference of the cost of delivering gas to different parties, and the difference in the cost of providing for it, and seeing about it, and regulating it, and collecting the bills, etc.
W. H. A. Reed, City Solicitor, and Brown & Geddes, attorneys for plaintiff.
Boyle, Seott & Lewis and Scribner & Hurd, attorneys for defendant.
It is said that the company is estopped because it has itself agreed to an ordinance fixing rates having these differences, not founded upon the actual amount of gas delivered; but it presents a different question, whether or not the company and the municipality might agree to an ordinance which would make these discriminations, and the passing of an ordinance by the municipality which would compel the company against its will to accede to an ordinance necessarily resulting in these inequalities. We think that in a case of this kind there should not be a narrow, captious inquiry into the provisions of the ordinance, and that it should not be subjected to a rigid criticism, so that it should be entirely perfect in every respect. But at least the provisions of it should not shock the natural sense of propriety and justice in any of these particulars.
It follows from the statement already made that this application must be denied. We think that the city, by the allegations of the petition, has not made out a case that would justify us, or warrant us in granting the extraordinary order that is sought. The plaintiff's petition is therefore dismissed at its costs.